

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00139-CR

THE STATE OF TEXAS, Appellant

V.

BILLY JOHN BELL, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 27013

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

A 2016 indictment charged Billy John Bell with three counts of aggravated sexual assault of a child and one count of indecency with a child.[1] All the acts for which Bell was indicted were alleged to have been perpetrated against C.M.[2] in 1999 and 2000. Because the State failed to preserve Child Protective Services (CPS) records of an investigation about the allegations that took place in 2006, which included a recorded interview of the victim, the trial court dismissed the indictment because Bell's right to due process had been violated.[3]

On appeal, the State contends that the trial court erred because Bell did not show that the State acted in bad faith. We agree, reverse the trial court's order dismissing the indictment, and remand for further proceedings.

## I.    Background

In August 2016, Detective Chris Bean with the Paris Police Department investigated an allegation that Bell had sexually assaulted C.M.'s son. During that investigation, C.M. told Detective Bean that Bell had also sexually assaulted her when she was younger and that she had reported the matter to the police. C.M. claimed that she met with CPS about her allegation of assault shortly after she reported it to the police. Bean's investigation also revealed that C.M.

---

[1]The indictment also charged Bell with one count of continuous sexual abuse of a young child. By separate order, the trial court granted Bell's motion to quash that portion of the indictment. The State does not challenge that order in this appeal.

[2]We refer to the victim, who was a minor at the time of the alleged offenses, by her initials. *See* TEX. R. APP. P. 9.10.

[3]In his amended motion to dismiss, Bell asserted, and the trial court concluded, that the State's failure to preserve evidence violated both his right to due process under the United States Constitution and his right to due course of law under the Texas Constitution. *See* U.S. CONST. amends. V, XIV; TEX. CONST. art. I, §§ 10, 19. We have held that the Texas Constitution's Due Course of Law Clause provides no greater protection regarding the State's loss or destruction of evidence in a criminal prosecution than the United States Constitution's Due Process Clause. *Jones v. State*, 437 S.W.3d 536, 540 (Tex. App.—Texarkana 2014, pet. ref'd).

reported the matter to the police in November 2006. As a result of C.M.'s allegations, Bell was ultimately charged with aggravated sexual assault of a child and indecency with a child.

After Bell was indicted, he issued a subpoena to CPS seeking records about the allegations made by C.M. in 2006. When CPS could not produce any records from its 2006–2007 investigation, Bell moved to dismiss the indictment on due process grounds. Bell argued that, because the State destroyed exculpatory evidence, he was denied due process under the United States and Texas Constitutions.

At the hearing on Bell's motion, C.M. testified that, in 2006, she was sixteen years old and lived with her mother next door to Bell, who was her step-grandfather. In November 2006, C.M. argued with her mother about whether C.M. should be left home alone one night. Because she did not feel safe with Bell next door, C.M. called the police. C.M. told the police that she did not feel safe at home alone because she had sexual issues with Bell. Evidently, an offense report was prepared, and a referral was made to CPS.

About one week after that incident, C.M. moved to Dallas to stay with her cousin. C.M. testified that, while in Dallas, someone from CPS came to her aunt's house to ask her about her allegations against Bell. C.M. said that the CPS representative recorded the interview, which lasted ten to fifteen minutes. C.M. maintained that, although the CPS representative asked her specifically what happened, C.M. did not say anything. She also explained that her grandmother had called and told her not to say anything. C.M. also testified that she did not speak to law enforcement after the CPS interview and that the case was not picked up or prosecuted by the district or county attorney.

3

Patrice Savage, a regional attorney for CPS, responded to a subpoena for records involving C.M. or Bell. She testified that the only records they had were from 2016. She did not know when the records from 2006–2007 were destroyed, but she stated that they were no longer in CPS's system. Savage testified that, if CPS found reason to believe that abuse occurred within a family, then the records would be kept for ninety-nine years. If the records were destroyed five years after the youngest victim turned eighteen, that showed that CPS had found no reason to believe the allegations. She also testified that she could say there was an intake in the 2006 case, but she could not say that there was an investigation.[4]

That said, Savage also testified that, if there were a sexual assault allegation involving someone who lived in the home, there would be a CPS investigation.[5] If the perpetrator did not live in the victim's home, the CPS records would not be retained because that would be a criminal case. She also testified that a CPS investigation is separate from any law enforcement investigation and that CPS does not keep records for law enforcement.

Detective Bean was also called to testify about his investigation and his conversation with C.M. in which she claimed that Bell had also done something to her when she was younger. C.M. told Bean that someone from CPS had talked with her in Dallas, but that she had not told CPS anything. Bean also testified that, in November 2006, an offense report was created.

---

[4]The parties entered stipulations, including that C.M. made an outcry in late 2006 about the offenses for which Bell was indicted in 2016, that CPS investigated C.M.'s allegations in November and December 2006 and January 2007, that CPS closed its investigation on or about January 26, 2007, and that no charges were filed against Bell on these allegations until November 2016.

[5]C.M. testified that she lived with her mother when she was fourteen to sixteen years old but that, for most of her childhood, she lived with her grandmother.

4

After the hearing on Bell's motion, the trial court granted Bell's motion to dismiss and entered findings of fact and conclusions of law. As summarized, the findings by the trial court included the following:

1. In November 2006, C.M., who was sixteen years old at the time, stated to law enforcement officers that she had issues of a sexual nature with Bell. Those issues were said to have happened during a time frame dating back to 1999 to 2000.

2. Because of C.M.'s allegations, a report was made to CPS.

3. Within one week of having made her outcry, C.M. moved to Dallas.

4. While in Dallas, a CPS investigator conducted a recorded interview with C.M.

5. According to C.M., the CPS investigator asked her questions about her outcry, but C.M. did not provide any information.

6. On January 26, 2007, CPS issued a letter to Bell stating that the case was closed.

7. CPS took no further action after January 26, 2007.

8. Although an offense report was made, C.M. was not interviewed by law enforcement.

9. In August 2016, Bean interviewed C.M. regarding allegations made by her son. During that interview, C.M. brought up the allegations she had made in November 2006.

10. On November 10, 2016, Bell was indicted as a result of C.M.'s statements relating to the 1999–2000 incidents.

11. During the course of this litigation, Bell served a subpoena on CPS seeking records relevant to this matter.

12. In response to that subpoena, CPS advised that the records from 2006 had been retained for five years in the CPS system and then destroyed in conformity with the CPS retention schedule.

5

13.   The CPS retention schedule provides that, if the outcome of the investigation were "reason to believe," the records would have been retained for ninety-nine years.

The trial court's conclusions of law included the following:

5.   Records of a CPS investigation finding "reason not to believe," which included an electronically recorded interview of a victim within a week of making an outcry, are undeniably exculpatory and their value to the Defendant is apparent.

6.   Had criminal charges been considered by the State in 2006, the Court would have expected the State to comply with their duty and preserved the CPS investigation records. Because CPS determined that there was "reason not to believe" the victim, the State chose to not pursue charges against the Defendant. Without an intent to prosecute, it would be unfair to impose a duty to preserve on the State.

7.   This Court does not find, nor by this ruling implies, that the State, by purposeful plan, destroyed the records to harm the Defendant in his defense of a criminal accusation.

. . . .

13.   . . . . The Defendant does not argue nor does the Court conclude that the CPS records might have been exculpatory. Instead, because the evidence was destroyed after 5 years because of "reason not to believe," then the evidence was clearly exculpatory and therefore material.

. . . .

15.   . . . . [T]he identity of the investigator is unknown to the Defendant which prevents him from calling that person as a witness in his defense.

## II.   The Trial Court Erred by Dismissing the Indictment

In its sole issue, the State contends the the trial court erred in dismissing the indictment against Bell. The State asserts two grounds in support of its issue: (1) dismissal was erroneous

6

when there was no finding of bad faith by the State as required by *Arizona v. Youngblood*,[6] and (2) the trial court improperly applied a totality-of-the-circumstances analysis. Bell argues that a bad-faith finding was not required since the evidence the State failed to preserve was material and exculpatory, citing *Illinois v. Fisher*,[7] *Youngblood*,[8] and *Brady v. Maryland*.[9]

### A. A Finding of Bad Faith Was Required

#### 1. Standard of Review

"An appellate court must uphold a trial court ruling that is reasonably supported by the record and is correct under any theory of law applicable to the case." *State v. White*, 306 S.W.3d 753, 757 n.10 (Tex. Crim. App. 2010). We review a trial court's dismissal of an indictment under a bifurcated standard to determine whether the trial court abused its discretion. *State v. Krizan-Wilson*, 354 S.W.3d 808, 815–16 (Tex. Crim. App. 2011). We "give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness." *Id.* at 815 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)). However, we apply "a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations." *Id.* (citing *Guzman*, 955 S.W.2d at 89).

---

[6]*Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

[7]*Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

[8]*Youngblood*, 481 U.S. at 57.

[9]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

7

###### 2. Applicable Law

It is a violation of due process when the State fails to disclose or suppresses material exculpatory evidence to the defendant, irrespective of the prosecution's good or bad faith. *Fisher*, 540 U.S. at 547 (citing *Brady*, 373 U.S. 83, 87; *United States v. Agurs*, 427 U.S. 97 (1976)); *McFarland v. State*, 928 S.W.2d 482, 511 (Tex. Crim. App. 1996). Exculpatory evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In a typical case, to prevail on a failure-to-disclose claim, the defendant must show that the evidence was both material and favorable to the defense so that there was a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). Those are not the circumstances presented in this case.

The State's constitutional duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984); *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). Under this standard, in order to show a due process violation, it must be shown that the evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. In addition, to constitute a denial of due process, the defendant must show bad faith on the part of the State in failing to preserve the potentially useful evidence. *Youngblood*, 488 U.S. at 58; *see Trombetta*, 467 U.S. at 488 (police acted in good faith and in accord with their normal practice in destroying breath samples); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (prompt deportation of witnesses was justified "upon

8

the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution").

The Texas Court of Criminal Appeals, and this Court, have stated that, under United States Supreme Court jurisprudence, "*Brady* addresses exculpatory evidence still in the government's possession. *Youngblood* and *Trombetta* address cases in which the government no longer possesses the disputed evidence." *Little*, 991 S.W.2d at 866; *Welch v. State*, No. 06-99-00106-CR, 2000 WL 661047, at *1 (Tex. App.—Texarkana May 23, 2000, pet. ref'd) (not designated for publication);[10] *see also Moody v. State*, 551 S.W.3d 167, 170 (Tex. App.—Fort Worth 2017, no pet.).

### 3. Analysis

Here, the trial court made an unchallenged finding that CPS destroyed its records in accordance with its document retention schedule. It also made an unchallenged conclusion of law that the State did not destroy those records with a purposeful plan to harm Bell in his defense of the criminal allegations. That finding of fact coupled with that conclusion of law[11] may be properly construed as an affirmative finding that the State did not act in bad faith when the records were destroyed. Since Bell failed to show bad faith on the part of the State in the failure to preserve this potentially useful evidence, no denial of due process was shown. *See Youngblood*, 488 U.S. at 58.

---

[10]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

[11]The record supports both the finding of fact and the conclusion of law.

Even so, Bell argues that, since the trial court also made findings that (1) the evidence was material and exculpatory[12] and (2) the CPS investigator was unknown to Bell, the rule in *Brady* should apply so that a showing of bad faith was not required. But Bell has cited no federal or Texas cases in which the *Brady* rule was applied in a case in which it was alleged that the State violated the defendant's due-process rights by failing to preserve evidence.[13]

Bell's argument ignores the reasoning behind requiring a showing of bad faith when the State fails to preserve potentially useful evidence. In *Trombetta* and *Youngblood*, the United States Supreme Court sought to define the limits of a state's constitutional duty to preserve evidence. In *Trombetta*, the Court noted,

> The absence of doctrinal development in this area reflects, in part, the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence.

*Trombetta*, 467 U.S. at 486–87 (citation omitted). As noted above, the Court held that a state's constitutional duty to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense" and that the "evidence must both possess an

---

[12]We note that no evidence in the record supports these findings. The evidence showed that the contents of the CPS records and the CPS interview were unknown.

[13]In *Little*, the State failed to preserve evidence, but the defendant alleged that the due process violation resulted from the State's failure to disclose that the evidence was lost. Because it was a failure to disclose claim, *Brady* applied. *Little*, 991 S.W.2d at 866.

exculpatory value *that was apparent before the evidence was destroyed*, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488–89 (emphasis added). The Court also considered the police officer's good faith and normal procedures in destroying the evidence in its rejection of the defendant's due process claim. *Id.* at 488.

In *Youngblood*, the Court again considered the limits of a state's constitutional duty to preserve evidence. In concluding that the defendant must show bad faith on the part of the state in its failure to preserve evidence, the Court reasoned:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Youngblood*, 488 U.S. at 58.

Here, there was no finding by the trial court, and no evidence in the record, that the prosecutor or the police were aware of the contents of the CPS records before they were destroyed or that any exculpatory value of the records was apparent before they were destroyed. Although the trial court concluded that the State chose not to prosecute because CPS determined that there was "reason not to believe,"[14] that does not equate to a finding that the prosecutor or the police were aware of the contents of the CPS records or of the CPS interview.

---

[14]We note that Bell was able to solicit testimony from Savage that CPS's destruction of its records after five years indicated that it had made a "reason not to believe" finding. Thus, Bell was able to obtain comparable evidence of CPS's finding by other means. *See Trombetta*, 467 U.S. at 488–89.

11

In addition, there is no finding, and no evidence in the record, that the prosecutor or the police were involved in any way in the decision to destroy the CPS records. Nor is there any evidence that CPS acted as an agent of, or at the direction of, the police or the prosecutor when it interviewed C.M. *See Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (recognizing that, while the duties of CPS include the investigation of child-abuse claims, "that alone does not automatically transform CPS case workers into law-enforcement officers or state agents"); *Wilkerson v. State*, 173 S.W.3d 521, 528–31 (Tex. Crim. App. 2005) (discussing the different and parallel roles of CPS and law enforcement and the factors for determining whether CPS was acting as an agent of law enforcement). As a result, any knowledge of CPS employee about the contents of their records cannot be imputed to the State.[15]

We find, on this record, that this case falls within the class of cases addressed by *Youngblood* and *Trombetta*. Since there was no finding, and no evidence in the record, of bad faith by the State in the failure to preserve the CPS records, we find that no violation of Bell's due-process rights has been shown. *See Youngblood*, 488 U.S. at 58.

**B.     The Trial Court's Improperly Applied a Totality-of-the-Circumstances Analysis**

In its conclusions of law, the trial court recognized that its finding that the State did not act in bad faith would generally require it to deny the motion to dismiss. Even so, the trial court concluded that "combined with other factors, a failure to preserve potentially exculpatory

---

[15]We are not suggesting that, if the State had pursued its investigation and charged Bell in 2007, it would not have had a duty to discover and preserve the contents of the CPS records if they were favorable to Bell's defense. But, here, the State did not pursue an investigation or charge Bell in 2007.

evidence, absent bad faith, can create the cumulative effect of a denial of due process," citing *Gilbert v. State*, 840 S.W.2d 138, 142 (Tex. App.—Houston [1st Dist.] 1992, no pet.). The court then concluded that the loss of evidence combined with other factors, including the material and exculpatory nature of the evidence, the "he said/she said" nature of the case, and the length of time since the alleged offense and its first report, led to a deprivation of due process. It also concluded that it was required to examine the totality of these circumstances to determine whether the evidence resulted in a trial so lacking in fairness as to offend due process, citing *Ex parte Brandley*, 781 S.W.2d 886, 892 (Tex. Crim. App. 1989, orig. proceeding), and *Gilbert*, 840 S.W.2d at 142. The State challenges all of these conclusions of law. Yet, Bell did not address the State's challenges in his brief. We review a trial court's conclusions of law de novo. *Krizan-Wilson*, 354 S.W.3d at 815.

In performing its totality-of-the-circumstances analysis, the trial court relied on *Brandley* and *Gilbert*. Neither of these cases stand for the proposition that a trial court, in considering a pretrial motion to dismiss, can ignore the requirements of *Youngblood* in determining whether the State violated a defendant's right to due process by failing to preserve evidence. In *Brandley*, the applicant's writ of habeas corpus alleged that the State's flawed investigative procedures created false testimony in violation of his rights to due process and a fair trial. *Brandley*, 781 S.W.2d at 887. The State also suppressed evidence favorable to Brandley, which he alleged supported a claim under *Brady*. As a result, the Texas Court of Criminal Appeals was required to consider the totality of the circumstances of the trial in order to determine whether the suppressed evidence was material. *Id*. at 893.

13

In *Gilbert*, the appellant also alleged that the State's investigative process violated his right to due process by failing to preserve evidence that might have played a significant role in his defense. *Gilbert*, 840 S.W.2d at 142. Because the appellant relied on *Brandley*, the court of appeals looked at the totality of the evidence at trial to determine that, even if the evidence had been preserved, it would not have affected the outcome of the trial. *Id*.

The appellate courts in *Brandley* and *Gilbert* reviewed the complete evidentiary record from the trial court, which enabled them to consider the totality of the circumstances in the trial court in determining whether their respective defendant's due-process rights had been violated. Here, no such record was before the trial court. Thus, a totality-of-the-circumstances analysis would be unworkable on this record since the trial court lacked a complete evidentiary record.

As noted earlier, the Texas Court of Criminal Appeals has found that *Youngblood* and *Trombetta* control cases in which "the government no longer possesses the disputed evidence." *Little*, 991 S.W.2d at 866. We, therefore, find that the trial court erred in its conclusions of law that considered other factors and applied a totality-of-the-circumstances analysis.

Since there was no finding that the State acted in bad faith when the CPS records were destroyed and the trial court erred by applying a totality-of-the-circumstances analysis, we find that the trial court erred in dismissing the indictment. We sustain the State's sole issue.

14

### III. Conclusion

For the reasons stated, we reverse the trial court's order dismissing the indictment and remand this case to the trial court for further proceedings.

Scott E. Stevens
Justice

Date Submitted:     December 5, 2019
Date Decided:       January 10, 2020

Do Not Publish