COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| THE STATE OF TEXAS, | | No. 08-17-00036-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 243rd District Court |
| | § | |
| ERLINDA LUJAN, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20160D04874) |
| | § | |

## **O P I N I O N**

The State appeals a trial court's suppression of two recorded statements taken as a part of a murder investigation. The appeal raises the question of whether the recorded statements were from a single interview for which Erlinda Lujan was properly informed of her rights at the outset, or whether the police conducted three separate interrogations, and as a part of the second and third sessions, used the "two-step" process (also referred to as the "question-first, warn-later" technique) to gain incriminating information. We also address whether the two-step issue was raised below, and whether the State properly perfected this appeal. We affirm in part and reverse in part.

## **BACKGROUND**

From the proceedings below, we gather that the several people involved in the events described here are methamphetamine users or sellers (or "tweakers" as they apparently call

themselves).[1]  In a companion case, Erlinda Lujan is charged with the murder of Anthony Trejo, tampering with his corpse, and tampering with other evidence.  Anthony Trejo was killed and his dismembered body dumped in the desert.  While investigating that crime, the police arrested Lujan and questioned her.  From that questioning, they learned information related to the aggravated kidnapping of Isaac Lujan and James Tyler Hall, for which she has been indicted in this case.

At issue are three police recordings of Lujan.  The State views the recordings as coming from the continuation of a single questioning session done at three times.  At the beginning of the first and third recordings, Lujan was informed of and acknowledged her *Miranda* and Article 38.22 rights.[2]  Conversely, Lujan views the interviews as three distinct interrogations and focuses on the lack of any *Miranda* warnings in the second interview.  She made several inculpatory statements in the second recording regarding the murder of Anthony Trejo, the aggravated kidnappings of Isaac Lujan and James Tyler Hall, and other crimes, which she repeated during the third recording.  She argued the third interview as the "fruit" of the second, and that both should suppressed.  The

---

[1]And once again we are confronted with an uncomfortable glimpse into the meth subculture.  *See e.g*. *Cucuta v. State*, 08-15-00028-CR, 2018 WL 1026450, at *1 (Tex.App.--El Paso Feb. 23, 2018, no pet. h.)(not designated for publication)(describing two methamphetamine users committing aggravated burglary, resulting in the shooting of one person, and killing of another); *Corbett v. State*, 08-15-00300-CR, 2017 WL 3614214, at *1 (Tex.App.--El Paso Aug. 23, 2017, pet. ref'd)(not designated for publication)(describing torture-murder within a ring of methamphetamine users); *Collins v. State*, 08-15-00103-CR, 2017 WL 192913, at *1 (Tex.App.--El Paso Jan. 18, 2017, pet. denied)(not designated for publication)(describing father, after ingesting methamphetamine, shooting and killing his daughter).

[2] *Miranda v. Arizona*, 384 U.S. 436, 442-44, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); TEX.CODE CRIM.PROC.ANN. art. 38.22 (West 2018).  Specifically, she was advised:

> You have the right to remain silent and not make any statement at all, and any statement you make may be used against you at trial.
> Any statement you make may be used as evidence against you in court.
> You have the right to have a lawyer present to advise you prior to and during any questions.
> If you're unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questions.
> You have the right to terminate the interview at any time.
> If you are not a United States citizen, you have the right to contact your consulate.

She was then asked if this statement was accurate to the very best of her knowledge:

> I understand my rights and I hereby knowingly, intelligently, and voluntarily waive these rights.

trial court agreed with Lujan, and while it allow the statements found in first recording, it suppressed recordings two and three. We detail the circumstances of all three recorded statements.

## First Recording

Lujan was first interviewed on September 27, 2016, by Detectives Ochoa and Camacho at a police station. The interview took place in a room rigged for audio and video recording. The recording starts at 4:27 p.m. and concludes at 4:42 p.m. Detective Camacho started the interview by obtaining Lujan's identifying information. Detective Ochoa then explained that they were investigating an incident concerning Anthony Trejo. Detective Ochoa informed Lujan that she was under arrest and informed her of her rights. She responded by saying "right" when asked if she was waiving those rights.

When Detective Ochoa first asked Lujan what she knew about Anthony Trejo, she launched into a long narrative that explained that "Sean" and "Filero" had phoned and told her that they had Trejo. She then asked them about retrieving a car they had taken from "the Guero" who as it later turned out, is how they referred to James Tyler Hall. They told her that she needed to come by Filero's residence to pick it up. When she got there, she found that Trejo was badly beaten. Sean and Filero said that Trejo "needed to die" and after they placed him in Sean's truck, she was told to drive him to Mexico She stalled for a time, and claimed to have helped Trejo. But when Sean and Filero pressed her further, she finally said, "You guys want -- you guys want to kill him, you guys kill him, 'cause I'm not gonna do it." In her words, she "wiped my hands of it."

Both Detectives Camacho and Ochoa then asked follow-up questions. Lujan explained that a few days later she had heard that Trejo had been killed. A short time later, Sean and Filero picked her up, and drove to a vehicle that contained four trash bags containing Trejo's remains.

3

She was told to help tape up the bags so she would be part of the crime. The remains were then driven out to a desert area in Northeast El Paso. When pressed to identify who was driving and directing her, she claimed she could not "snitch them out" but offered to take the detectives to where the body was buried. After the detectives obtained permission from a supervisor to take her to the burial site, Detective Ochoa told Lujan, "And when we come back, we can continue, if you like, okay?"

### Second Recording

Lujan then accompanied Detectives Ochoa and Camacho by car to the area where she believed the body had been dumped. The audio only recording of their discussions in the car starts at 4:48 pm, some twenty-one minutes after she had received *Miranda* and Article 38.22 warnings on the first recording, and six minutes after the first recording ends. The second recording runs over three hours. Because Ochoa was driving, Detective Camacho did most of the questioning, but Ochoa asked substantive questions as well. Detective Camacho recorded the interrogation by placing an "iPad" between he and Lujan. He did not tell her that she was being recorded, and did not re-inform her of her rights. He had turned the iPad's recording feature on before they got into the car.

Much of the discussion related to the location of the body. During gaps in that discussion, however, she was asked, or volunteered, additional information relevant to several issues bearing on her criminal charges.

#### *Pre-death contact with Trejo*

Lujan claimed that Sean and Filero turned on Trejo because he was acting crazy, threatening to kill people, and report everyone to the Mexican cartel. Lujan further explained that while she was supposed to take Trejo to Mexico, she instead took him to her apartment. While

4

there, however, his legs were tied and he was kept in a bathroom. She spoke with him, offered him drugs, and admitted that at one time she oversaw him at the apartment. She identified the location of the apartment, and witnesses who were present during that time. She also admitted to paying another person with drugs to clean out the truck that Trejo had been transported in. She eventually left the apartment, leaving Trejo in the bathtub.

### *Kidnapping Isaac Lujan and James Tyler Hall*

During the drive-around, she also discussed Isaac Lujan (no relation) who Sean and Filero had tied and handcuffed. He was also being held in her apartment. She admitted injecting him with heroin (as she claims, to ease his pain). When she left the apartment for the final time, she claims to have dropped Isaac off, who was still handcuffed, at a fire station.

Lujan also related the story about Trejo, when he was on better terms with Sean and Filero, beating up some "white boy," (or "the Guero"). Trejo hit him with butt of a shot gun, and apparently took his car. She claims to have taken "the Guero" to her apartment to keep him from being killed. The detectives later identified "the Guero" as James Hall. In the case before us, Lujan has been indicted as part of a criminal enterprise that committed the aggravated kidnapping of Isaac Lujan and James Hall. Prior to the drive-around, she was not considered a suspect in those crimes.

### *Other Crimes*

Lujan also admitted to working as an as escort. She admitted to using heroin and methamphetamine. She also admitted to smuggling methamphetamine across the border for Sean. She provided the detectives other potentially useful information to the investigation, including the identity of other persons who were present when the body was driven out to the desert, the location of a gas station that might have film footage of those involved in the body's disposal, the password

5

for her internet phone account, and her email address.

Lujan identified the general area where the body was dumped, but could not take the detectives to the exact spot.

### Third Recording

They arrived back at the police station around 8:00 p.m. The third recording, taken in an interrogation room, begins at 10:00 p.m. and ends about two hours later. Detective Camacho began the third session by stating it was a "continuation of our interview that we had taken before[.]" He re-read Lujan her rights, and she again stated that she understood them.

Detective Camacho said he wanted to "recap on what we've talked about, okay?" The detectives then asked Lujan a series of questions that had her repeat information discussed on the second recording, including what she told them about Trejo's murder, the disposal of his body, and the kidnapping of Isaac Lujan and James Hall. At the suppression hearing, Detective Camacho agreed that the information on the second recording is "pretty much identical" to that on the third recording.

### Motion to Suppress

Lujan filed a motion to suppress any recorded statement, claiming that any such statement was inadmissible under Article 38.22, was involuntarily given, and she did not knowingly, intelligently, and voluntarily waive her statutory and constitutional rights under *Miranda*. Both Detectives Ochoa and Camacho testified at the hearing. Detective Camacho considered all three recordings as part of one interrogation. Both detectives testified that Lujan's unexpected and urgent desire to show them where the body was located caused the interrogation to be continued in the car. Detective Camacho likened the six-minute gap between the end of the first recording to the start of the second to a bathroom break, where suspects are usually not re-read their *Miranda*

6

rights.

Lujan argued that the detective's actions were more sinister. She claimed that the detective did not re-read the *Miranda* rights because "he wanted to make sure" that they could record the conversation and that she would not invoke any of her rights. Detective Camacho acted in a "shady manner" by placing the iPad, which was already in record mode, between he and Lujan, and not informing her that the conversation was being recorded. Lujan then argued that the information repeated in the third recording was "fruit of the poisonous tree" (using the phrase four times).

## Court's Order and Findings

The trial court denied the motion to suppress the first recording. It granted, however, the request to suppress the second and third recordings. Its findings of fact and conclusions of law in the most relevant part conclude:

> 30. Based on the demeanor of the witnesses and totality of circumstances, the Court finds that by--a) telling Ms. Lujan that they could continue the statement when they returned; b) moving Ms. Lujan from the interview room to the car; c) having Detective Camacho lead the interrogation in the car; d) talking about other cases; and e) failing to remind Ms. Lujan that the *Miranda* warnings of Statement One were still in effect--Statement Two was not a continuation of Statement One and the *Miranda* warnings given in Statement One were no longer effective during Statement Two.
>
> 31. Based on the demeanor of the witnesses and totality of circumstances, the Court finds that by--a) telling Ms. Lujan that they could continue the statement when they returned; b) moving Ms. Lujan from the interview room to the car; c) having Detective Ochoa lead the interrogation in the car; d) talking about other cases; e) failing to remind Ms. Lujan that the *Miranda* warnings of Statement One were still in effect; and f) failing to read Ms. Lujan *Miranda* warnings in the car--the Detectives deliberately sought to circumvent Ms. Lujan's *Miranda* protections.
>
> …
>
> 33. Based on the demeanor of the witnesses and totality of circumstances, the Court finds that the Detectives moved Ms. Lujan from police headquarters to their vehicle to acquire an advantage in the interrogation process and to deliberately employ a 'question first, warn later' interrogation technique so as to circumvent Ms. Lujan's *Miranda* protections.

7

The trial court then concluded that the second recording should be suppressed because it was not a continuation of the first recording, and there were no *Miranda* or Article 38.22 warnings given. The trial court excluded the third recording based on the detectives' deliberate use of the question first, warn later technique.

The State brings three issues challenging the trial court's ruling. Before addressing the State's substantive issues, we deal with Lujan's procedural challenge to this appeal.

### THE STATE'S NOTICE OF APPEAL IS SUFFICIENT

Our jurisdiction to hear the case is dependent on the State's compliance with Article 44.01(a)(5) of the Criminal Procedure Code that allows an appeal of a trial court order granting a motion to suppress evidence, a confession, or an admission. TEX.CODE CRIM.PROC.ANN. art. 44.01(a)(5)(West 2018); *State v. Redus*, 445 S.W.3d 151, 152 (Tex.Crim.App. 2014). The statute requires the prosecuting attorney to certify to the trial court (1) that jeopardy has not attached, and (2) that "the appeal is not taken for the purpose of delay and that the evidence, confession, or admission is of substantial importance in the case[.] *Id*. at § 44.01(a)(5). The prosecuting attorney's certification required by Article 44.01(a)(5) is jurisdictional; it is also a representation by an officer of the court that the appeal is not for delay and the suppressed evidence is material. *Redus*, 445 S.W.3d at 155 n.14; *State v. Villegas*, 460 S.W.3d 168, 169 (Tex.App.--El Paso 2015, no pet.).

In its notice of appeal, the El Paso County District Attorney certified "that jeopardy has not attached in this case, the appeal is not taken for the purpose of delay, and the *evidence* is of substantial importance in the case." [Emphasis added]. Lujan contends the notice is defective, however, because it attempts to certify an appeal from the suppression of "evidence" and not a "confession" or "admission." She argues that we must construe the statute to give meaning to each

8

of the three words the legislature used (evidence, confession, admission), and what is at issue here is either a confession or an admission, but not "evidence." Because the State did not certify that Lujan's *statement* or *confession* was of substantial importance, she claims we cannot hear that question. We disagree.

Lujan's argument turns on the legislature's use of the three terms in a series. Her argument necessarily assumes that each term must have a distinct and mutually exclusive meaning. And generally, courts must "presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible." *State v. Hardy*, 963 S.W.2d 516, 520 (Tex.Crim.App. 1997). This rule of construction is often referred to as the "surplusage" canon. *See* Antonin Scalia, Bryan Garner, Reading Law: The Interpretation of Legal Texts, 174 (2012). The canon, however, has limits:

> Put to a choice, however, a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage. So all like all other canons, this one must be applied with judgment and discretion, and with careful regard to context. It cannot always be dispositive because (as with most canons) the underlying proposition is not *invariable* true. Sometimes drafters *do* repeat themselves and do include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach. Doublets and triplets abound in legalese: [citing examples]"

*Id.* at 176-77 [emphasis original]. The context of Article 44.01 instructs that the triplet in Article 44.01(a)(5) includes words with overlapping meaning.

Article 44.01 was enacted to allow "the State to challenge 'questionable legal rulings excluding what may be legally admissible evidence[.]'" *State v. Medrano*, 67 S.W.3d 892, 895 (Tex.Crim.App. 2002), *quoting* Article 44.01's bill analysis. As here, those rulings generally follow a pre-trial motion to suppress, as authorized by Article 28.01 of the Code of Criminal Procedure. Article 28.01, however, allows such "motions to suppress *evidence*." [Emphasis added]. TEX.CODE CRIM.PROC.ANN. art. 28.01 § 1 (1)(6)(West 2006). If we applied Lujan's logic

9

that each term in the triplet "evidence, statement or confession" has a distinct meaning, then equally true the omission of "statement or confession" from Article 28.01 suggests a court could not hear a motion to suppress those items. For that matter, a statement can also be a confession, and a confession is always some kind of statement. Because it would strain reason to ascribe mutually exclusive definitions to each term in this triplet, we conclude that the statute's context dictates that the terms must be used in a more common-sense fashion.

And in common parlance, a "statement" by a defendant is evidence in a criminal case--hence the legion of cases that consider inculpatory statements when evaluating challenges to the legal sufficiency of the *evidence* to support a conviction. *E.g. Rivera v. State*, 808 S.W.2d 80, 92 (Tex.Crim.App. 1991)(jailhouse statements considered as part of sufficiency of evidence challenge); *Encina v. State*, 471 S.W.2d 384, 387 (Tex.Crim.App. 1971)(confession considered as part sufficiency of evidence challenge); *Hernandez-Palomares v. State*, 08-15-00312-CR, 2017 WL 4277308, at *5 (Tex.App.--El Paso Sept. 27, 2017, no pet.)(not designated for publication) (same). Additionally, in the era when courts drew greater distinctions between direct and circumstantial evidence, a defendant's inculpatory statement was explicitly referred to as "direct evidence." *See e.g. Hankins v. State*, 646 S.W.2d 191, 195 (Tex.Crim.App. 1981); *Ridyolph v. State*, 545 S.W.2d 784, 789 (Tex.Crim.App. 1977). Moreover, Lujan's statements are not merely something the detectives heard. They are contained on DVDs that were offered as exhibits below. The word "evidence" itself is broadly defined as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact[.] *Evidence*, Black's Law Dictionary 673 (10th ed. 2014). The DVD recordings, and the statements found on them, easily fall within that definition.

10

We overrule Lujan's contention that the State's Notice of Appeal is defective.

## ONE INTERVIEW OR TWO?

The trial court's rationale in excluding the second and third recordings was essentially this: while Lujan may have been adequately warned before the first recording, the second recording was made from a distinct and different interrogation. The second recording was not merely a continuation of the first, and because no warnings were given during the second interview, it cannot stand on its own. The third recording must be excluded as well, because it was part of a prohibited "question first, warn later" tactic.

*Miranda v. Arizona* imposes an obligation on the police, *prior* to a custodial interrogation, to apprise the suspect of (1) the State's intention to use any statements to secure a conviction, (2) the right to remain silent, and (3) the right to counsel. 384 U.S. at 468-470, 86 S.Ct. at 1624-26, 16 L.Ed.2d 694 (1966). Texas codifies this requirement in TEX.CODE CRIM.PROC.ANN. art. 38.22 § 3(a)(2)(West 2018).[3] If the police intentionally circumvent the *Miranda* and Article 38.22 protections by questioning the suspect first, *then* giving the warnings, they have engaged in a "two-step" or "question first, warn later" interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 611, 124 S.Ct. 2601, 2609, 159 L.Ed2d 643 (2004); *Martinez v. State*, 272 S.W.3d 615, 626 (Tex.Crim.App. 2008). The intent of this two-step tactic is to obtain a confession before the defendant understands her rights--then read the defendant her rights--and have the defendant repeat the confession. *Id.* Texas prohibits the deliberate use of this two-step tactic. *Carter v. State*, 309 S.W.3d 31, 38

---

[3] That Code provision provides that no statement can be used unless a defendant received the warning that: "(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; (2) any statement he makes may be used as evidence against him in court; (3) he has the right to have a lawyer present to advise him prior to and during any questioning; (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and (5) he has the right to terminate the interview at any time[.]" TEX.CODE CRIM.PROC.ANN. art. 38.22 § 2(a). Further, the accused must "prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section." *Id.* at § 2(b). No claim is made that the warnings given did not mirror those in Article 38.22.

(Tex.Crim.App. 2010)(holding that the deliberate employment of a "question first, warn later" interview technique will call for the suppression of a suspect's unwarned and warned statements); *Martinez*, 272 S.W.3d at 626.

The first linchpin of the trial court's reasoning, therefore, is that no warnings were given prior to the second recording, and the premise of that conclusion, is that the second recording was not merely a continuation of the first. Lujan must prevail on that point, because the law is well settled that a mere pause in police questioning does not require additional warnings. *See Dunn v. State*, 721 S.W.2d 325, 338 (Tex.Crim.App. 1986)("rewarning is not required where the interrogation is only a continuation about the same offense"), *abrogated on other grounds by Creager v. State,* 952 S.W.2d 852, 856 (Tex.Crim.App. 1997); *Burruss v. State,* 20 S.W.3d 179, 183-84 (Tex.App.--Texarkana 2000, pet. ref'd)(three-minute pause in interrogation did not require re-warning); *Franks v. State,* 712 S.W.2d 858, 861 (Tex.App.--Houston [1st Dist.] 1986, pet. ref'd)(three and one-half hour pause did not require re-warning). The State urges that there was only a short pause between the first and second interviews, such that they were one continuous interview. The trial court found the opposite. Accordingly, we start with that challenge to the trial court's finding, which the State raises as its second issue on appeal.

### Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010). That discretion is tested under a bifurcated standard of review as articulated in *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App. 1997). *See Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Krug v. State*, 86 S.W.3d 764, 765 (Tex.App.--El Paso 2002, pet. ref'd). Under that bifurcated standard, we give almost total deference to the trial court's resolution of questions of historical fact, especially when those

determinations are based on assessments of credibility and demeanor. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex.Crim.App. 2013). Likewise, we give the same deference to trial court rulings that apply the law to the facts if those determinations turn on credibility or demeanor. *Arguellez*, 409 S.W.3d at 662; *State v. Alderete*, 314 S.W.3d 469, 472 (Tex.App.--El Paso 2010, pet. ref'd). Nonetheless, statements in the trial court findings of fact about the role of witness credibility are not binding. *See State v. Mechler*, 153 S.W.3d 435, 439 (Tex.Crim.App. 2005)("[A] statement in a trial judge's findings of fact and conclusions of law regarding the role witness credibility played in its decision cannot determine an appellate court's standard of review. The court's inclusion of this sentence in its findings does not grant it the ability to control how its rulings will be reviewed."). We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor. *Arguellez*, 409 S.W.3d at 662.

When the trial court makes explicit fact-findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact-findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex.Crim.App. 2006). Regardless of whether the motion to suppress was granted or denied, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. García-Cantú*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008). An appellate court may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.Crim.App. 2007).

### Applicable Law

Whether one interview is a continuation of an earlier interview is determined from a totality of the circumstances. *See Dunn*, 721 S.W.2d at 338. The Texas Court of Criminal Appeals articulated four of those circumstances in *Bible v. State*: (1) the passage of time, (2) whether the

13

interrogation was conducted by a different person, (3) whether the interrogation related to a different offense, and (4) whether the suspect is reminded of the earlier recitation of their rights. *See Bible v. State*, 162 S.W.3d 234, 242 (Tex.Crim.App. 2005); *Cotten v. State*, No. 08-13-00053-CR, 2013 WL 6466186, at \*4 (Tex.App.--El Paso Dec. 4, 2013, pet. stricken)(not designated for publication). *Bible* derived these factors from a series of cases cited in the footnote of its earlier opinion in *Jones v. State*, 119 S.W.3d 766, 773 n.13 (Tex.Crim.App. 2003), *cert. denied,* 542 U.S. 905, 124 S.Ct. 2836, 159 L.Ed.2d 270 (2004). Nothing in *Bible* or *Jones*, or subsequent cases, suggest these factors are exclusive.

### Discussion

The trial court here made several findings that bare on the *Bible* factors. In particular, the trial court found:

> 30. Based on the demeanor of the witnesses and totality of circumstances, the Court finds that by--a) telling Ms. Lujan that they could continue the statement when they returned; b) moving Ms. Lujan from the interview room to the car; c) having Detective Camacho lead the interrogation in the car; d) talking about other cases; and e) failing to remind Ms. Lujan that the Miranda warnings of Statement One were still in effect-Statement Two was not a continuation of Statement One and the Miranda warnings given in Statement One were no longer effective during Statement Two.

We initially agree with the State that first *Bible* factor--the length of the break between the first and second interview--weighs heavily in its favor. The second recording begins about twenty-one minutes after Lujan was apprised of her rights, and only six minutes after the termination of the first interview. No case holds such a short interlude significant, and many longer breaks have been considered, and rejected as negating the effectiveness of *Miranda* warnings. *See, e.g*., *Bible*, 162 S.W.3d at 241-42 (two interview sessions were continuous when the second session began less than three hours after the beginning of the first session); *Ex parte Bagley,* 509 S.W.2d 332, 337 (Tex.Crim.App. 1974)(same for six to eight-hour break); *Franks,* 712 S.W.2d at 860-61 (same

14

for three and one half-hour break between interviews); *State v. Munoz*, 08-16-00023-CR, 2018 WL 1517006, at *8 (Tex.App.--El Paso Mar. 28, 2018, no pet. h.)(not designated for publication) (same for approximate one-hour break); *Cotten*, 2013 WL 6466186, at *4-5 (same for two-hour break).

Two of the other *Bible* factors, however, are neutral at best. The trial court found that Detective Ochoa led the first interview, while Detective Camacho took the lead in the second interview. The questions asked by both are manifest from the transcript, and while both asked substantive questions in both sessions, Ochoa predominated in one, and Camacho in the other.[4] The trial court also found that the second interview raised different and additional inquiries into separate crimes. The record does show that the first interview broached the Trejo's murder, and the theft of James Hall's car. The second interview included Anthony Lujan and James Hall's kidnapping, Lujan's drug usage and smuggling, and her role in the disposal of Trejo's body. The finding, however, is hardly surprising given that the first interview was fifteen minutes long, and the second more than three hours.

The final *Bible* factor, however, weighs the heaviest against the State. The detectives did not remind Lujan of her rights.

The State implicitly argues, and we would agree that the four *Bible* factors are not posed in the conjunctive in the sense that the State must check each off to prevail. There are cases upholding a trial court finding that one interview is a continuation of another when one of the factors is missing. *See e.g. Jackson v. State*, 01-16-00242-CR, 2018 WL 1003362, at *4 (Tex.App.--Houston [1st Dist.] Feb. 22, 2018, pet. ref'd)(no reminder of *Miranda* rights given

---

[4] We note, however, in *Bible* a different detective led the questioning in each session, but both were present at all time, and did not cause the court to find there were two separate interrogations. *Bible*, 162 S.W.3d at 241-42 ("Although different officers conducted questioning during each session and each session focused on a different set of crimes, the same officers were present during both sessions.").

after three-hour break in questioning, yet the second interview was a continuation of the first); *Stallings v. State*, 09-09-00200-CR, 2010 WL 2347244, at *3 (Tex.App.--Beaumont June 9, 2010, pet. ref'd)(mem. op.)(not designated for publication)(same, when only a matter of minutes passed between two interviews); *Crayton v. State*, 03-14-00570-CR, 2016 WL 6068250, at *5 (Tex.App.--Austin Oct. 14, 2016, pet. ref'd)(mem. op.)(not designated for publication)(different topics raised in second interview did not break continuation from first, particularly when new information developed from open ended questions).

Yet here, the trial court also relied on two other circumstances. First, the second interview was in a different setting--a car as distinct from an interview room. Were that the trial court's sole additional rationale, we might discount it as we did in *Cotten v. State,* 08-13-00051-CR, 2013 WL 6405511, at *4 (Tex.App.--El Paso Dec. 4, 2013, pet. stricken)(not designated for publication)(first interview in bedroom when defendant arrested, and second at the police station). But the trial court here also relied on the detective's statement at the end of the first recording that "when we come back, we can continue, if you like." The detective's statement is the sharpest cut against the State's position. In common parlance, the statement would signal the end of something with the prospect that it could be continued. And the detective did not say we can continue when we get in the car to drive out to the body. He said they could continue when they got back to the police station. The State suggests that the trial court was merely speculating that Lujan understood this statement to mean that her statements during the second recording would not be used against her. It points out that on the second recording, Lujan became upset and stated, "I just don't like it that you guys act like you don't know what you're doing. You know exactly what you're doing. That's gonna f**k up my whole life." From this, the State surmises that Lujan knew her incriminating statements would be used against her. But our standard requires that witness demeanor calls reside

16

with the trial court which had the actual recordings before it.

In sum, the detective's statement about continuing when they returned to the station, joined with the failure to remind Lujan of her waiver of rights when the second interview began, and the way it was recorded, causes us to conclude the trial court did not abuse its discretion in finding that the second interview was not a continuation of the first. And because the second recording does not begin with any sort of *Miranda* or Article 38.22 warnings, we affirm the trial court's conclusion that it is excludable. We overrule Issue Two.

## TWO-STEP INTERROGATION
## (QUESTION-FIRST, WARN-LATER)

The trial court excluded the third recording because it found that the detectives used the two-step technique to circumvent Lujan's *Miranda* protections. The State does not explicitly attack the evidence supporting the trial court's finding that the detective used the two-step process. Instead, its first issue claims that Lujan never urged that claim below, and thus the trial court could not base its ruling on an unasserted argument.

The State's argument raises two sub-issues. First, we must decide if a trial court is restricted to the grounds asserted by a movant, either in their motion to suppress or argument raised at the hearing. And if so, we must secondarily decide if Lujan fairly raised the "two-step" argument such that the State was on notice that it was being asserted in this case. Two preservation of error cases are instructive to our determination of the first sub-issue. In *State v. Esparza*, 413 S.W.3d 81 (Tex.Crim.App. 2013) the court considered whether a defendant who prevailed in a motion to suppress could defend the ruling on a ground not raised at the trial court. The trial judge had excluded the results of an intoxilyzer because the State failed to present evidence showing the circumstances under which the test results were obtained. *Id*. at 84. On appeal to this Court, we reversed on that theory, reasoning that the trial court incorrectly allocated the burden to present

evidence of those circumstances. *State v. Esparza*, 353 S.W.3d 276, 284 (Tex.App.--El Paso 2011). We also denied the defendant's alternative claim that the trial court's ruling was correct because the State failed to present any evidence that the science behind the intoxilyzer was reliable--a Rule 702 evidentiary ground. *Id*. at 282. We did so because that argument had not been raised at the trial court. *Id.*

The defendant then appealed to the Texas Court of Criminal Appeals. He urged that the oft cited statement in our standard of review that we may uphold a trial court's ruling if it is supported by the record and correct under any legal theory of law applicable to the case would allow for an unasserted ground to be considered on appeal.[5] The Court of Criminal Appeals concluded, however, that the Rule 702 ground was not a legal theory *applicable to the case* because it had not been raised below. 413 S.W.3d at 90. The court emphasized that while a reviewing court might generally consider any legal grounds to affirm the correct ruling on appeal, that general rule has exceptions. *Id*. at 89. And one exception is that fair notice was important in the context of the unique evidentiary burdens of a Rule 702 challenge to expert and scientific evidence. *Id.* at 90. Once placed at issue, the advocate for scientific evidence carries the burden to show its reliability, and in *Esparza*, the State was never informed that a Rule 702 challenge was before the trial court. *Id.*

The State also points us to *Vasquez v. State*, 483 S.W.3d 550 (Tex.Crim.App. 2016). In *Vasquez*, the accused filed a generic motion to suppress his two statements to the police. *Id.* at 554. The trial court denied the motion in part. *Id.* at 553. On appeal, the court of appeal concluded that the trial court erred because the two police interviews were part of a two-step tactic. *Id.* The

---

[5] The court refers to this as the *Calloway* rule, after *Calloway v. State*, 743 S.W.2d 645, 651-52 (Tex.Crim.App. 1988)(holding the prevailing party at the trial court level need not explicitly raise an alternative theory in the court below to justify the appellate court's rejection of an appellant's claim).

Court of Criminal Appeals reversed the court of appeals, however, because the two-step issue had not been properly raised to the trial court. *Id*. The defendant's counsel had briefly mentioned the concept late into his argument, but there was no indication the prosecutor or the trial court acknowledged or understood the claim was being asserted. *Id*. at 554. The court noted the issue was important because the two-step theory requires a finding that the police conduct was intentional, and the State was denied the opportunity to present testimony on its detectives' intentions. *Id*. at 555.

Both *Esparza* and *Vasquez* are preservation of error cases. Either the winning or losing party attempted to raise an issue on appeal that was never presented to the trial court. This case is different in the sense the trial court expressly based its ruling on a legal theory, but a theory the State asserts it was never alerted to. Even recognizing that difference, the rationale from *Esparza* and *Vasquez* leads us to conclude that the non-movant in a motion to suppress is entitled to notice of a legal theory that requires specific evidence by the non-movant to address. And that situation is raised here. The Court's decision in *Siebert* is limited to the "infrequent" case where the police intentionally use the two-step process to circumvent *Miranda* warnings. *Seibert*, 542 U.S. at 621-22, 124 S.Ct. at 2615 (Kennedy, J., concurring). The detective in *Siebert* admitted that his supervisor specifically instructed him to talk to the defendant before any warnings were given. *Id*. at 609, 124 S.Ct. at 2608. *Siebert* also distinguished an earlier opinion, where an inadvertent unwarned statement did not require the exclusion of a later interview. *Id*. at 614, 124 S.Ct. at 2611 (distinguishing *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). Texas cases following *Siebert* have adopted Justice Kennedy's concurrence which limits the opinion to intentional police actions. *Carter v. State*, 309 S.W.3d 31, 38 (Tex.Crim.App. 2010)("We therefore join numerous state and federal jurisdictions in adopting Justice Kennedy's concurrence

19

in *Seibert* because it is narrower in scope than the plurality opinion and applies only to two-step interrogations involving deliberate police misconduct."). Therefore, we agree that the State was entitled to notice that a "two-step" issue was being raised. With that warning, it might appreciate that the evidence of the police's intent as to that specific issue--either from both detectives, or perhaps their supervisor, would be necessary.[6]

We then arrive at the next sub-issue: was the State put on notice that the two-step questioning strategy? In deciding this question, we are guided by Rule of Appellate Procedure 33.1 that requires a litigant to present objections to the trial court by a timely request, objection, or motion, that is sufficiently specific to make the trial court aware of the complaint. TEX.R.APP.P. 33.1. Yet in applying that rule, lawyers are not put to hyper-technical requirements for error preservation. *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App. 1992)("[T]here are no technical considerations or form of words to be used. Straightforward communication in plain English will always suffice."). "Instead, a party need only let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Vasquez*, 483 S.W.3d at 554. A general or imprecise objection will suffice if "the legal basis for the objection is *obvious* to the court and to opposing counsel." [Emphasis in original]. *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex.Crim.App. 2006). In deciding if that standard is met, we may consider "the parties' shared understanding at that time." *Pena v. State*, 285 S.W.3d 459, 464 (Tex.Crim.App. 2009).

Lujan's motion to suppress is generic, and while the motion includes a string citation to

---

[6] We consider but reject the option of a motion for rehearing as an adequate safeguard to the trial court ruling on an unasserted ground. The State has twenty-days from the date of the suppression order to perfect its appeal. TEX.CODE CRIM.PROC.ANN. art. 44.01(d)(West 2018). As here, the findings of fact and conclusions of law are sometimes prepared and filed after the actual order is signed. Given those time constraints, a motion to reconsider that might marshal additional evidence is an impractical solution to the lack of notice problem.

several cases, it does not cite any of the leading two-step cases. The suppression hearing did not begin with any sort of opening statement outlining what Lujan intended to prove. Rather, it began with Lujan examining both detectives Ochoa and Camacho. They were questioned about several theories, such as whether Lujan appeared to be under the influence of drugs, or whether she had been threatened with denial of access to her children. Much of the questioning of Detective Camacho focused on whether he conducted three separate interrogations, or whether the three sessions were the continuation of a single interrogation. Detective Camacho was asked if *Miranda* warnings were given before the second interview, and if the substance of the second interview was re-asked in the third interview. He was never directly asked if *Miranda* warnings were intentionally not given in the second interview to obtain admissions that could be repeated in a third properly *Mirandized* session. Detective Ochoa's questioning was limited to the question of whether Lujan had ever invoked her right to counsel, or whether her children were used as a lever to get her to talk--an issue that never appears in the trial court's findings of fact. The State had a third detective present who was not called to testify.

In the brief closing statements at the hearing, Lujan did not use the term "two-step" or "question-first, warn-later." Her attorney did, however, argue that the detectives acted intentionally in how they transitioned from the first to the second interrogations to circumvent Lujan's *Miranda* rights.[7] He argued that the lack of *Miranda* warnings in the second interview

---

[7] Her counsel argued:

> So it appears to me that it's pretty clear that what the detective did was -- in not rereading the *Miranda* warning was that he wanted to make sure that the -- that he was able to record the conversation with my client and that she would not invoke any of her rights at that point. So he did not read the warnings. He had perfect opportunity to do so. It's pretty -- I think you can take from the fact that he was utilizing the iPad and had it in between the two of them what his intent was and that he was acting in a -- I'll just call it a shady manner. And because he knew that if he in any way identified the iPad and the fact that the statement was being recorded at that point, that my client likely would invoke one of her constitutional rights.

precluded its use under Article 38.22. Lujan then argued that the third recording was the "fruit of the poisonous tree."[8] The State's attorney did not address a two-step argument, but rather focused on whether the interviews were continuations of a single interrogation, and whether the re-administration of *Miranda* rights in the third interview removed any taint. Lujan's argument at the hearing addressed elements of the two-step theory, particularly the police's intent to conduct one interview where Lujan would not invoke her rights. She did not, however, join that with a clear statement that the detectives planned the entire sequence of events to use a two-step process to have Lujan repeat in a warned setting, her previous admissions from the unwarned setting. Parts of her argument also overlaps with the dispute over whether the several recordings are continuations of a single interrogation, or three distinct interviews. And like in *Vasquez*, any mention of the two-step process, oblique at best, came at the argument stage after the evidence had closed and the witnesses released. The trial judge, who acknowledged doing his own research into the case, may have comprehended the two-step argument, but the State's attorney apparently did not. The State's attorney did not have detective Ochoa answer any questions about the intentions behind the second recording. The State's attorney principally argued that there was one continuous interrogation, and also that the *Miranda* warnings in the third interview removed any taint. *Siebert*

---

[8] As to the third recording, her counsel argued:

> That then moves onto statement number 3, which, you know, we have that funny phrase 'fruit of the poisonous tree' again. Basically evidence or statements obtained from an illegal arrest or something illegal or something -- actually even in some violation of the law or statutory rule like 38.22, if evidence is produced or obtained because of that violation of 38.22, that evidence which is seized or otherwise obtained by the police department also should be -- should be suppressed, and then of course because it's fruit of the poisonous tree.
> …
>
> 'They teased all the information out of my client during that oral statement, which should be excluded. When they came back, they thought, okay, they had already told her when we -- basically, when we get back, there will be a continuation. And based on the fruit of poisonous tree doctrine, statement 3 should also be thrown out.'

22

outlines its own series of curative measures that remove a taint, and the prosecutor addressed none of those factors in his argument.[9]

Lujan argued the third interview was excludable as fruit of the poisonous tree, but that metaphor is not a synonym for the two-step process. Fruit of the poisonous tree is commonly ascribed to a Fourth Amendment case, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Siebert* is the lead case on the two-step process. It was a fractured opinion with four justices writing a plurality, one of those justices concurring, Justice Kennedy concurring, and four justices writing in dissent. The plurality rejected the fruit of the poisonous tree metaphor, noting that it had been similarly rejected in *Elstad*. *Seibert*, 542 U.S. at 612, 124 S.Ct. 2610, n.4. The four dissenters specifically agreed with this conclusion. *Id*. at 623, 124 S.Ct. at 2616 (O'Connor, dissenting)("First, the plurality appropriately follows *Elstad* in concluding that Seibert's statement cannot be held inadmissible under a 'fruit of the poisonous tree' theory."). Only one justice in concurrence likened the court's rationale to a "fruit" analysis. *Id.* at 618, 124 S.Ct. at 2613 (Breyer, J., concurring)("I believe the plurality's approach in practice will function as a 'fruits' test."). Justice Kennedy's controlling concurrence never mentions a "fruit of the poisonous tree" rationale, and it is his concurrence that Texas follows. *Carter*, 309 S.W.3d at 38; *Martinez*, 272 S.W.3d at 620-21. We doubt the State's attorney could have picked up that the two-step process was being raised merely by Lujan's counsel mentioning the "fruit of the poisonous tree" metaphor, particularly given the context of the entire proceeding.

---

[9] *Seibert*, 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring). Those curative measures must "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id*. They might include "a substantial break in time and circumstances between the prewarning statement" and the second interview so that the accused might "distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id*. They might alternatively include informing the suspect that, although they previously gave incriminating information, they are not obligated to repeat it. *Martinez*, 272 S.W.3d at 626-27. The interrogating officers might also "refrain from referring to the unwarned statement unless the defendant refers to it first" or "if the defendant does refer to the pre-*Miranda* statement, the interrogating officer states that the defendant is not obligated to discuss the content" of that first statement. *Id*.

23

Accordingly, we reverse the trial court's suppression of the third recording (Exhibit 3a and 3) based on the State's first issue. We emphasize: the reversal is not based on the merits of the argument, but only on the lack of notice to the State that the two-step argument was at issue. As Justice Keller wrote in his *Esparza* concurrence, a ruling on a motion to suppress is not a "final decree." 413 S.W.3d at 92 (Keller, J., concurring). The trial court may always revisit the issue:

> But when the appeal is interlocutory, as is the case with a State's appeal from the granting of a motion to suppress, the trial is not over. Further proceedings will occur in the trial court regardless of how the appeal is resolved. If the appellate court determines that the prevailing party's particular argument in the trial court was unsound, the prevailing party still has the ability to make further arguments to the trial court when the case returns to the trial court after the appeal. The evidence might be excluded at trial on another basis, or if the evidence cannot be excluded in its entirety, the party might be able to articulate a reason for excluding a portion of the evidence.

*Id.* at 92-93. On remand, we trust any issues about proper notice of the grounds being asserted in the motion to suppress will be answered.

## THE STATE'S THIRD ISSUE IS MOOT

The State's third issue argues that the trial court erred in suppressing the third recording because under the totality of the circumstances, all three interviews were part of one continuous interrogation, and in in any event the *Miranda* warnings given before the third session, remove any taint. Its argument appears to assume, however, an inadvertent failure to provide earlier *Miranda* warnings such as in *Elstad*, rather that the intentional two-step process as described in *Siebert*. If the two-step process applies, then *Siebert* requires the exclusion of a statement obtained by the two-step process unless specific curative measures are taken. *Seibert*, 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring). The State does not argue that any of those specific curative measures were taken here, and does not attack the trial court's finding that they were not taken. Rather, it argues that we should not consider the two-step process because it was not

24

properly raised below.  We have agreed with that position, and reversed the trial court's reliance on that argument.  Further, we view the trial court's conclusions of law as excluding the third recording only because it found the police intentionally used the two-step technique.[10]  We therefore find it unnecessary to address what are best hypothetical arguments about how the trial court might address the third recording in the absence of the two-step process findings.  Accordingly, we do not reach the merits of the issue three, and overrule it as moot.

The order suppressing the second recording (Exhibit 2 and 2a) is affirmed.  The trial court's order suppressing the third statement (Exhibit 3 and 3a) is reversed, and the cause remanded for proceedings not inconsistent with this opinion.

September 28, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

---

[10] Conclusion of Law 10 excludes the third recording based on the detective "deliberate employment a 'question first, warn later' technique . . . and the existence of inadequate curative measures."  Conclusion 11 excludes the statement based on TEX.CODE CRIM.PROC.ANN. art. 38.23 (West 2018).  That provision precludes admission of evidence obtained in violation of other laws, such as the United States Constitution.  It is not an independent ground for excluding the third recording.  And the trial court Conclusion of Law that the recording was excluded based on the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Texas Constitution, is not an independent basis to exclude, separate and apart from the two-step process argument.  The reference to the federal protections are the underpinning of *Miranda*, that are the basis for what *Siebert* protects from the two-step process.  Article I, Section 9 of the Texas Constitution protects citizens from "all unreasonable seizures or searches" and outlines the requirements for warrants.  Its application to the case is unclear.